IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| CATHY REYNOLDS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 7:21-cv-00220 |
| ) | |
| SGT. JOEL CAMP, *et al.*, ) | By: Elizabeth K. Dillon |
| ) | United States District Judge |
| Defendants. ) | |

**MEMORANDUM OPINION**

Attorney Cathy Reynolds (Reynolds) brings this action against Sergeant Joel Camp, Detective John Haley, and Officer Does 1–5 of the Roanoke Police Department (RPD) (collectively "defendant officers") alleging violations of her First, Fourth, and Fourteenth Amendment rights during a search of her home that occurred days after she helped secure the acquittal of her stepson, who was facing state murder charges. (Compl., Dkt. No. 1.) Specifically, Reynolds alleges that the defendant officers' search of her home was (1) unreasonable and unreasonably destructive, (2) in retaliation for the successful defense of and continued association with her stepson, and (3) racially discriminatory. The case is currently before the court on defendant officers' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 9.) The motion has been fully briefed and argued. For the reasons stated below, the court will grant the motion with respect to the First and Fourteenth Amendment claims and deny the motion with respect to the Fourth Amendment claim.

1

I. BACKGROUND[1]

Cathy Reynolds is an African American attorney who primarily practices criminal law in Roanoke. (Compl. ¶ 2.) Reynolds and two white attorneys represented Reynolds's stepson, Darreonta Reynolds (D. Reynolds), in his criminal trial after he was indicted for murder. (*Id.* ¶¶ 21–23.) Det. Haley served as a critical witness against D. Reynolds, and Sgt. Camp and other officers also testified. (*Id.* ¶¶ 24–25.) D. Reynolds was acquitted of all charges on September 26, 2019, after the jury found that he acted in self-defense. (*Id.* ¶ 26.)

Three days after the acquittal, the defendant officers arrived at Reynolds's home and told her they believed that Ozmeik Clements, who had a warrant out for his arrest, was hiding in her home. (*Id.* ¶¶ 28–30.) She informed them that she did not know Clements, and he was not at her house. (*Id.* ¶31.) The officers said they would return with a search warrant, and some of them left to obtain one, while several officers stayed behind outside of Reynolds's home. (*Id.* ¶¶ 32–33.) One officer noted that Reynolds had made progress on her home renovations, stating, "I see you got your house done." (*Id.* ¶¶ 34–35.) Reynolds "granted the officers who remained posted outside her home consent to search her home for Clements," and informed the officers that they could search her home and that she would leave the door unlocked. (*Id.* ¶¶ 36–37.) The officers, however, awaited the search warrant. In the meantime, agents from the Bureau of Alcohol, Tobacco, and Firearms (ATF) set up a staging area in a church parking lot across the street from Reynolds's home, and the officers closed Reynolds's street and put yellow police caution tape

---

[1] The following facts, which are accepted as true for the purposes of a 12(b)(6) motion, are taken from Reynolds's complaint. (Compl., Dkt. No. 1.)

around her house, and a crowd of spectators gathered. (*Id.* ¶¶ 39–40, 42–43.)

Sgt. Camp obtained the warrant to search Ms. Reynolds's home, which authorized the search for "the person of Ozmeik Rae Quan Clements." (*Id.* ¶¶ 44–45.) The probable cause affidavit that accompanied the warrant said that ATF Special Agent Teehan had received a call from a "reliable confidential informant" who had "provided reliable information to him on multiple occasions recently." (*Id.* ¶ 47.) The supposed informant allegedly told Teehan that he observed Clements on the front porch of Reynolds's home with Aaron and Darreonta Reynolds, and that he had seen Clements there "on more than one occasion in the past couple of days and believe[d] he is residing there." (*Id.*) The affidavit also noted that officers had been surveilling Reynolds's home and D. Reynolds and Aaron Reynolds, Reynolds's husband, were seen there; it was not alleged that the officers saw Clements at the home.[2] (*Id*)

After the officers returned with the warrant, officers from RPD's SWAT team arrived in an armored vehicle and parked in Reynolds's driveway. (*Id.* ¶ 64.) Despite Reynolds leaving her home unlocked and informing the officers that she did so, the "SWAT officers used an entry tool attached to the front of the armored vehicle to puncture the screen door and rip it free from Reynolds' home." (*Id.* ¶ 65.) This maneuver damaged the screen door, "damage[d] the door frame surrounding the front entry, and tore vinyl siding from the exterior" of Reynolds's home.

---

[2] The complaint pleads upon information and belief that the affidavit contained false information. Reynolds alleges that Teehan did not receive a tip from a confidential informant, and Sgt. Camp was aware that there had been no tip, or alternatively, if there was a tip, Sgt. Camp knew the substance of the tip to be false. (*Id.* ¶¶ 50–51, 53–56.) However, at the hearing on the motion to dismiss, Reynolds withdrew her claim based on a false information theory, instead asserting that the warrant was defective because of material omissions, namely, omitting the fact that D. Reynolds and Aaron Reynolds lived at the address provided.

(*Id.* ¶ 66.) SWAT officers then entered her home by turning the doorknob on the door that remained. (*Id.* ¶ 67.) The officers searched Reynolds's home for about two to three hours, (*Id.* ¶¶ 67–68.) They opened and searched all the drawers in her kitchen, detached the appliances from the walls, flipped the mattresses off the beds, tore all the clothes from the closets in the bedrooms, tore the cushions off the furniture, emptied the contents of open soda cans onto the floor, causing thousands of dollars of damage. (*Id.* ¶¶ 69–72.) The two white attorneys who represented D. Reynolds did not have their homes searched. (*Id.* ¶ 73.)

On April 4, 2021, Cathy Reynolds brought suit against Sgt. Joel Camp, Det. John Haley, and Officer Does 1–5 of the RPD in their individual and official capacities,[3] pursuant to 42 U.S.C. § 1983, asserting claims under the Fourth and Fourteenth Amendments for unreasonable search and unreasonably destructive search (Count I), under the First for interfering with free speech and association (Count II), and under the Equal Protection Clause of the Fourteenth Amendment for race-based discrimination (Count III). (*Id.* at 11, 13, 14.)

## II. DISCUSSION

### A. Motion to Dismiss Standard

To survive a motion to dismiss, a pleading must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible if the plaintiff pleads factual content that allows the court to draw a "reasonable inference that the defendant is liable for the alleged

---

[3] Through briefing and argument, Reynolds has conceded that she has not stated an official capacity claim against defendant officers. (Mem. Opp. to Mot. to Dismiss at 2, Dkt. No. 12.)

misconduct." *Iqbal*, 556 U.S. at 678. In determining whether Reynolds has satisfied this plausibility standard, the court must accept as true all well-pleaded facts in the complaint and "draw[] all reasonable factual inferences from those facts in [Reynolds's] favor," *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), but it need not "accept the legal conclusions drawn from the facts" or "accept as true facts or unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

### B. Unreasonable and Unreasonably Destructive Search in Violation of the Fourth and Fourteenth Amendments

Reynolds pursues her Fourth Amendment claim on two theories. She insists that the search was unreasonable because her consent was not voluntary, and the warrant secured was fatally defective due to material omissions. Additionally, Reynolds alleges that the search of her home was unreasonably destructive.

#### 1. Legal Standards

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Carpenter v. United States*, --- U.S. ----, 138 S. Ct. 2206, 2213 (2018). "The basic purpose of this Amendment…is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Id.* (internal quotations omitted). "It is a basic principle of Fourth Amendment law…that searches and seizures inside a home without a warrant are presumptively unreasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (internal quotations omitted). "[A] warrant may not be issued unless probable cause is properly established and the scope of the

authorized search is set out with particularity." *Id.* (citing *Payton v. New York*, 445 U.S. 573, 584 (1980)).

An exception "to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). Consent must be voluntary—it cannot be "coerced, by explicit or implicit means, by implied threat or covert force." *Id.* at 228. Consent is valid until it is withdrawn. *United States v. Ortiz*, 669 F.3d 439, 445 (4th Cir. 2012). However, officers cannot exceed the scope of a person's consent to search.

While "the emphasis of the [Fourth] Amendment has been upon the need for officers to get a warrant, the requirement of probable cause, and the descriptive material within the warrant itself," the protections of the Fourth Amendment do not "vanish once officers lawfully set foot inside the door." *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). When officers engage in excessive or unnecessary destruction of property during the execution of a search, they may violate the Fourth Amendment, providing a basis for liability under 42 U.S.C. § 1983. *Id.* at 168–69 (citing *United States v. Ramirez*, 523 U.S. 65, 71 (1998)).

**2. Consent**

*a. Voluntariness*

Defendant officers argue that Reynolds consented to the search of her home and never withdrew consent, providing an exception to the warrant and probable cause requirements and a valid basis to search Reynolds's home. (Dkt. No. 10 at 6.) They argue that her claims related to deficiencies and omissions in the search warrant should be dismissed. (*Id.*) Reynolds argues

that her alleged "consent" was not voluntary due to a "coercive show of authority" by the officers. (Dkt. No. 12 at 7.) Thus, she contends her consent does not provide an exception to the warrant and probable cause requirements, which she claims are also not met in this case.

As noted, consent must be voluntary, otherwise, it would be "no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Schneckloth,* 412 U.S. at 228. To evaluate whether a search was consensual, courts look to the "traditional definition of voluntariness." *Id.* at 229. The traditional approach evaluates consent based on the totality of the circumstances, considering both the characteristics of the person and the details of the incident. *Id.* at 226. Some of the factors considered have included the person's age, education level, intelligence, and knowledge of constitutional rights. *Id.* at 226. Whether someone knows that they have the right to refuse consent is not a "necessary prerequisite" to showing that consent was voluntary. *Id.* at 230–33. Additionally, courts consider the length of the encounter, physical force used, and prolonged questioning among other things. *Id.* at 226. Importantly, the analysis does not "turn[] on the presence or absence of a single controlling criterion," rather it requires "careful scrutiny of all the surrounding circumstances." *Id.*

In no uncertain terms, Reynolds pled that she "desired the interaction to end and granted the officers who remained posted outside of her home consent to search her home for Clements." (Compl. ¶ 36.) Further, Reynolds "specifically informed officers…that her front door was unlocked and would remain unlocked should they desire to enter her home to look for Clements." (*Id.* ¶ 37.) Despite these concessions, she now argues the officers coerced her consent by commenting on the renovations to her home, arriving in an armored vehicle, and

attracting the public to surround her home. (*Id.* ¶ 35.)

The totality of the circumstances belies the argument that the consent was involuntary. Looking to personal characteristics, Reynolds is a highly educated, intelligent attorney with expertise in criminal law. It is reasonable to assume that Reynolds is intimately familiar with her rights under the Fourth Amendment, including giving consent and withdrawing it. The officers had already left to secure a search warrant, and Reynolds surely knew she could require a warrant.

Further, the characteristics of the incident do not provide a basis to support Reynolds's contention that her consent was involuntary. There are no allegations of physical force or explicit shows of authority such as the unholstering of a firearm. Further, the allegation that an officer commented, "I see you got your house done," is not sufficient to qualify as verbal coercion.

Reynolds does not plead that she was coerced in her complaint. Instead, she focuses on the fact that the officers did not initially act on her consent, preferring to wait for other officers to return for a warrant. This argument ignores that voluntary consent is valid until withdrawn, *Ortiz*, 669 F.3d at 445, which an experienced criminal defense attorney surely knew. Rather than withdraw her consent, Reynolds reaffirmed it by letting the officers know the door would remain unlocked. In sum, Reynolds unambiguously granted the officers consent, reaffirmed that consent, and never withdrew it. Therefore, the officers were relieved of the warrant and probable cause requirements and could validly enter Reynolds's home.

### b. Scope of Consent

To determine the scope of a person's consent, courts look to what the "typical reasonable person would have understood by the exchange" between the officer and the person. *Guerrero v. Deane*, 750 F. Supp. 2d 631, 646 (E.D. Va. 2010) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). Reynolds granted the officers "consent to search her home *for Clements*."[4] (Compl. ¶ 36 (emphasis added).) It is alleged that SWAT officers searched Reynolds's home for 2–3 hours, opened and searched drawers, detached appliances, flipped mattresses, ripped clothes out of closets, and dumped the contents of soda cans on the floor. (*Id.* ¶¶ 69–71.) There can be no question that even a small man cannot hide in a soda can. It is obvious that a person consenting to a search of her home for a wanted adult clearly does not contemplate the extensive and intrusive search allegedly executed by the defendant officers.

While Reynolds's consent was voluntary, the complaint clearly and sufficiently alleges a claim that the officers exceeded the scope of Reynolds's consent. Thus, Reynolds has successfully pled a claim under the Fourth Amendment for an unreasonable search.

### 3. Unreasonably Destructive

A separate question from the voluntariness and scope of Reynolds's consent is whether the officers were excessively or unreasonably destructive. When analyzing the execution of a search, "Fourth Amendment reasonableness kicks in." *Cybernet*, 954 F.3d at 168. The question is whether "the destruction of property is, as an objective matter, reasonably necessary to execute

---

[4] While the court need not consider the search warrant given Reynolds's voluntary consent, the court notes that the search warrant only provided a basis for searching the home for the "person of Ozmeik Rae'Quan Clements." (Pl.'s Ex. A, Dkt. No. 2.)

9

a lawful search warrant." *Id.* at 169. Officers need not choose the least destructive means in their search; the means must simply be objectively reasonable. *See id.* at 169–70. Finally, it is "*excessive* damage to property that is objectively unreasonable," which requires "more than accidental or incidental injury to property in the course of working within the parameters of a lawful search warrant." *Id.* at 170 (emphasis in original).

For many of the same reasons the allegations sufficiently allege a claim the officers exceeded the scope of Reynolds's consent, the allegations suffice to state a claim the search was unreasonably destructive. A "salient guidepost for analyzing whether property damage exceeds constitutional bounds concerns the relationship between the damage alleged and the object of the search." *Id.* at 171. It is alleged that during the search for a wanted adult, the officers opened and searched all the drawers in Reynolds's kitchen, detached the appliances from the walls, flipped the mattresses off the beds, tore all the clothes from the closets in the bedrooms, tore the cushions off the furniture, emptied the contents of open soda cans onto the floor, and caused thousands of dollars of damage. (Compl. ¶¶ 69–72.) Further, the officers allegedly destroyed the screen door, damaged the door frame, and tore vinyl siding from the exterior of the home, despite being given consent to enter and being told the door was unlocked. (*Id.* 65–66.) The alleged damage had "little connection to the object of the search," which was Clements. Reynolds has sufficiently pled that the officers engaged in an unreasonably destructive search of her home.

In sum, the court finds that the allegations in the complaint show that Reynolds voluntarily consented to the officers' search of her home; however, she states a claim that the

officers exceeded the scope of her consent and engaged in an unreasonably destructive search. Defendant officers' motion to dismiss Count I of the complaint will be denied.

### C. Retaliation and Interference with Free Speech and Associational Rights in Violation of the First Amendment

Reynolds alleges that the defendant officers' unconstitutional search was in retaliation for her exercise of her right to free speech and infringed on her rights to associate with her stepson. Defendant officers argue that Reynolds did not engage in protected speech and no associational right exists under the First Amendment, and, even if such a right exists, no adverse effect has been alleged.

With respect to freedom of speech, Reynolds pled that she "engaged in protected speech when she advocated for the acquittal of the criminal charges against her stepson, D. Reynolds, *in Court*," and the officers retaliated against her by destructively searching her home. (Compl. ¶¶ 91, 93 (emphasis added).) In their motion to dismiss, defendant officers argue that Reynolds did not engage in protected speech when she advocated for D. Reynolds in court, citing *Mezibov v. Allen*, 411 F.3d 712, 720–21 (6th Cir. 2005). (Mem. in Supp. of Mot. to Dismiss 10, Dkt. No. 10.) Reynolds failed to address this argument in her opposition briefing, focusing instead on Reynolds right to associate with D. Reynolds. At the hearing, Reynolds clarified that she was not contending her speech in court was protected, preferring to proceed only with an associational claim.[5] (Hr'g Tr. 9:22-25–10:1-8.)

---

[5] The court notes that in *Mezibov v. Allen*, the Sixth Circuit held that "in the context of the courtroom proceedings, an attorney retains no personal First Amendment rights when representing his client in those proceedings." 411 F.3d 712, 720–21 (6th Cir. 2005). The court was careful to note that "attorneys clearly retain some First Amendment rights outside of the courtroom, even for speech that touches upon their representing clients." *Id.* at 720 n.6.

With respect to freedom of association, Reynolds pled that the officers retaliated against her for her "continued association with her stepson" by destructively searching her home. (Compl. ¶¶ 92–93.)  To state a First Amendment retaliation claim, Reynolds must allege that (1) she engaged in protected First Amendment activity, (2) the defendant officers took some action that adversely affected those rights, and (3) there was a causal relationship between her protected activity and the defendant officers' conduct.  *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020).

As a threshold issue, it is not clear to the court that any such claim exists under the First Amendment.  Indeed, many courts have concluded that claims of familial right of association are "properly based on the concept of liberty in the Fourteenth Amendment."  *Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993); s*ee also*, *Mayo v. Lane*, 867 F.2d 374, 375 (7th Cir. 1989) ("The concept of liberty in the Fourteenth Amendment has been held to embrace a right to associate with one's relatives."); *IDK, Inc. v. Clark Cnty.*, 836 F.2d 1185, 1192 (9th Cir. 1988) (finding Fourteenth Amendment is "most often identified" as the source of protection for "certain kinds of highly personal relationships").  The Fourth Circuit has held that "the sanctity of the family unit is a fundamental precept firmly ensconced in the Constitution and shielded by the Due Process Clause of the Fourteenth Amendment." *Hodge v. Jones*, 31 F.3d 157, 163 (4th Cir. 1994); s*ee also*, *Martin v. Saint Mary's Dept. Social Services*, 346 F.3d 502, 506 (4th Cir. 2003); *Nelson v. Green*, 965 F. Supp. 2d 732, 744 (W.D. Va. 2013).

The court declines to decide whether an associational right between stepmother and stepson exists under the First Amendment, because, even if it does, Reynolds has failed to plead that her association with her stepson has been adversely affected by the defendant officers'

actions. There are no allegations in the complaint that D. Reynolds no longer lives with Reynolds because of the search or that the two no longer associate for fear of further retaliation. Thus, Reynolds has failed to state a claim for First Amendment retaliation.

**D. Discrimination Based on Race in Violation of the Fourteenth Amendment**

Reynolds alleges that when defendant officers searched her home, they discriminated against her in violation of the Fourteenth Amendment because she is African American. (Compl., Dkt. No. 1.) Defendant officers contend that these are conclusory claims without a factual basis and that her house was searched because officers received a tip from a confidential informant that someone accused of murder was at Reynolds's house, not because of her race. (Dkt. No. 10 at 11–12.) Further, defendant officers argue that Reynolds has not shown she received different treatment than someone "similarly situated." (*Id.* at 11.)

To state an Equal Protection claim, Reynolds must show "that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose." *Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 634–35 (4th Cir. 2016). To survive a motion to dismiss in an equal protection claim, the plaintiff must set forth specific factual allegations that are probative of an improper motive. *Johnson v. Holmes*, 204 F. Supp. 3d 880, 890 (W.D. Va. 2016) (citing *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003)). Additionally, the plaintiff must show he or she has been "treated differently from others with whom [plaintiff is] similarly situated" and that this "was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F. 3d 648, 654 (4th Cir. 2001). The court must then determine if the "disparity in treatment can be justified under the requisite level of scrutiny." *Id.* Strict scrutiny is applied to race-based

13

classifications. *Id.*

Reynolds's evidence that she was targeted because of her race consists of the fact that "the white attorneys, who also engaged in protected speech in their defense of Ms. Reynold[s'] stepson, were not subjected to unreasonable and excessively destructive searches of their homes by Defendants." (Compl. ¶ 108, Dkt. No. 1.) Reynolds's Fourteenth Amendment claim is complicated by her other concessions and theories. Reynolds conceded that she is not alleging that Sgt. Camp provided false information in his warrant affidavit, only that he materially omitted information. That is, that the officer did receive a confidential tip but that he failed to mention that D. Reynolds and Aaron Reynolds, Reynolds's husband, lived at the address provided, rendering the fact that they were present less probative. Further, Reynolds has conceded that she is not alleging that her speech in court is protected; rather, her First Amendment claim is rooted in her familial relationship with her stepson, not her status as one of his defense attorneys.

Given these concessions and theories, Reynolds has not shown that she was treated differently than someone of another race that was "similarly situated." While Reynolds and her white co-counsel are similar in that all three helped secure D. Reynolds acquittal, with respect to the facts alleged, the three are different in important ways. There is no allegation that the white attorneys are intimately associated or related to D. Reynolds, while Reynolds is D. Reynolds's stepmother and cohabitant. Further, given Reynolds's concession regarding the existence of the confidential informant, there are no allegations that the officers also received a tip that an unrelated murder suspect had been seen at the white attorneys' houses. Reynolds's familial

relationship with D. Reynolds and the existence of a tip that a murder suspect was at Reynolds's house show that Reynolds was not "similarly situated" to her white co-counsel to show disparate treatment. Thus, Reynolds has not sufficiently pled a claim for racial discrimination under the Fourteenth Amendment.

### III. CONCLUSION

For the reasons stated above, the court finds that Reynolds has sufficiently stated a claim for the violation of her Fourth Amendment rights; however, she has failed to sufficiently state claims for violations of her First and Fourteenth Amendment rights. The court will issue an appropriate order.

Entered: March 29, 2022.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge